IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| LAMMERS BARREL PRP GROUP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| CARBOLINE COMPANY; DAYTON ) | COMPLAINT |
| INDUSTRIAL DRUM, INC.; GEM CITY ) | |
| CHEMICALS, INC.; NCR CORPORATION; ) | |
| SUNOCO, INC.; WORTHINGTON ) | |
| INDUSTRIES, INC.; and YENKIN- ) | |
| MAJESTIC PAINT CORPORATION, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

For its Complaint, Plaintiff Lammers Barrel PRP Group ("Lammers Barrel PRP Group"), by and through counsel, alleges as follows:

### STATEMENT OF THE CASE

1. This is a civil action pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). The Lammers Barrel PRP Group asserts there has been a release and/or threat of release of hazardous substances from a facility known as the Lammers Barrel Factory Superfund Site ("Site") located in Beavercreek, Greene County, Ohio. These hazardous substances have contaminated the soil and groundwater at and in the vicinity of the Site and have threatened the public health and the environment. Each of the Defendants generated and/or transported hazardous substances that were disposed of at the Site. In addition, Defendants Carboline Company and Dayton Industrial Drum, Inc. are former owners and/or operators at the

Site during a time period when hazardous substances were disposed of at the Site. This action seeks contribution of over $6 million in past response costs incurred by the Lammers Barrel PRP Group at the Site in response to the release and threatened release of hazardous substances into the environment at and from the Site, and a declaration of each Defendant's liability for future response costs to be incurred by the Lammers Barrel PRP Group (and its assignors) at the Site.

## JURISDICTION AND VENUE

2. This Court has exclusive jurisdiction over the First Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 42 U.S.C. §§ 9607 and 9613. The Court also has jurisdiction over the Second Claim for Relief to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

3. Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the threatened and actual releases of hazardous substances that give rise to this action occurred and/or are occurring in this District and the Site is located in this District.

## ALLEGATONS COMMON TO ALL CLAIMS

4. The Site occupies approximately 2.5 acres in the City of Beavercreek, Greene County, Ohio. The Site is located on the northeast corner of the intersection of Grange-Hall Road with East Patterson Road. Little Beaver Creek runs east to west through the center of the Site.

5. The Moran Paint Company ("Moran Paint") operated a paint production facility at the Site from approximately 1944 to 1951.

6. From in or about 1953 until late 1969, various entities conducted solvent recovery and barrel reconditioning operations including the purchase, storage, reclamation and sale of industrial solvents including chlorinated volatile organic compounds ("VOCs") and aromatic hydrocarbons at the Site. The operations included a large, concrete storage pad and two-story

processing facility, with above-ground storage capacity of over 500,000 gallons. Approximately five pipes led from the building foundation directly into Little Beaver Creek.

7. During Site operations, solvents were spilled and seeped into soils in and around the Site and leached into surface water and groundwater underneath the Site.

8. On or about September 30, 1969, an explosion and fire destroyed the building and the stock of chemicals at the Site, including approximately 6,000 drums.

9. As a result of the fire, solvents were spilled and seeped into soils in and around the Site and leached into surface water and groundwater underneath the Site.

10. In or about late 1985, residential and commercial wells in the vicinity of the Site were discovered to be contaminated with VOCs.

11. The United States Environmental Protection Agency ("EPA") conducted various "response" activities, as defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), in response to the release or threat of release of hazardous substances at the Site.

12. On or about April 9, 2002, a group of twenty (20) PRPs, including members of the Lammers Barrel PRP Group and others, entered into a separate Administrative Order on Consent for Remedial Investigation/Feasibility Study ("RI/FS") ("2002 AOC") to examine the various possible means of remedying the contamination at the Site, as well as reimburse oversight costs incurred by EPA and the Ohio Environmental Protection Agency ("Ohio EPA").

13. On or about September 29, 2003, EPA placed the Site on the National Priorities List ("NPL"), pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605.

14. In or about August 2008, the parties to the 2002 AOC completed and EPA approved the RI for the Site.

15. The RI identified numerous hazardous substances in the soil, sediment, and groundwater at the Site, and identified the following chemicals of concern: benzene; benzo[a]pyrene; cis-1,2-dichloroethene; dibenzo(a,h)anthracene; ethylbenzene; indeno(1,2,3-cd)pyrene; polychlorinated biphenyls ("PCBs"); tetrachloroethene; toluene; trichloroethane; vinyl chloride; and xylenes. All of these are listed as hazardous substances at 40 CFR Part 203, Table 302.4 (1987), and are therefore "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

16. After completion of the RI, but before completion of the FS, EPA separated the response activities at the Site into two Operable Units ("OU1" and "OU2"). The Site and surrounding property constituted OU1, for which the respondents to the 2002 AOC would complete an FS. A contaminated groundwater plume that was migrating off-Site to the east, north of East Patterson Road constituted OU2, for which additional investigation was required.

17. On or about June 30, 2011, the respondents to the 2002 AOC completed and EPA approved the Operable Unit 1 Feasibility Study ("OU1 FS").

18. Based on the information collected in the RI and the OU1 FS, EPA selected a remedy for OU1 in a Record of Decision ("OU1 ROD") which EPA issued on September 27, 2011. The OU1 ROD required of the respondents to the 2002 AOC, inter alia, in-situ soil mixing to treat chlorinated VOCs and benzene, toluene, ethylbenzene and xylenes ("BTEX") contaminants, and enhanced in-situ bioremediation to treat chlorinated VOCs and BTEX contaminants in groundwater beneath the Site.

19. Additional investigation of the contaminated groundwater plume and the Operable Unit 2 Feasibility Study ("OU2 FS") are ongoing.

20. On or about May 4, 2012, EPA, the Lammers Barrel PRP Group and others began negotiating a Remedial Design/Remedial Action ("RD/RA") Work Plan to implement the OU1 ROD, and completed negotiations on or about July 31, 2013.

21. On January 31, 2014, the United States filed a Complaint under Sections 106 and 107 of CERCLA against the Lammers Barrel PRP Group and other PRPs in the case styled *United States v. 3M Company, et al.*, No. 3:14-cv-32 ("Underlying Case").

22. On May 8, 2014, the Court in the Underlying Case entered the Remedial Design/Remedial Action ("RD/RA") and De Minimis Consent Decree between EPA and the Lammers Barrel PRP Group, along with several non-performing settling defendants, which required the Lammers Barrel PRP Group to pay certain EPA past response costs and to perform the response cost activities required by the OU1 ROD at the Site ("Lammers Barrel OU1 RD/RA Consent Decree").

23. To date, the Lammers Barrel PRP Group has incurred over $6 million in response costs to perform various response cost activities at the Site.

24. The response costs incurred to date by the Lammers Barrel PRP Group are consistent with the NCP.

25. The Lammers Barrel PRP Group will continue to incur millions of additional dollars of response costs to perform the various response costs activities at the Site.

26. The Lammers Barrel PRP Group has also incurred and will continue to incur additional recoverable response costs, including attorneys' fees and expenses that are closely tied to the response actions at the Site.

27.     Pursuant to Section 113(*l*) of CERCLA, 42 U.S.C. § 9613(*l*), the Lammers Barrel PRP Group has provided a copy of this Complaint to the Attorney General of the United States and the Administrator of EPA.

## THE PARTIES

28.     The members of the Lammers Barrel PRP Group are Akzo Nobel Coatings, Inc.; Arconic Inc. f/k/a Alcoa Inc. o/b/o Stolle Corporation; Arkema Inc.; C.P., Inc.; Ford Motor Company; GATX Corporation; Georgia-Pacific LLC; Hexion Inc.; I.V.C. Industrial Coatings, Inc.; International Paper Company; Meritor, Inc.; Morton International, LLC; Navistar, Inc.; PPG Industries, Inc.; United Technologies Corporation; and Valspar Corporation, in their own right, and as assignees of the CERCLA claims at the Site of those entities who have or will settle with the Lammers Barrel PRP Group and who assign such CERCLA claims to the Lammers Barrel PRP Group.

29.     Each of the members of the Lammers Barrel PRP Group has assigned its CERCLA cost-recovery and contribution claims at the Site to the Lammers Barrel PRP Group.

30.     Each of the members of the Lammers Barrel PRP Group is a signatory to the Lammers Barrel OU1 RD/RA Consent Decree.

31.     Defendant Carboline Company ("Carboline") is the successor to Moran Paint.

32.     Carboline purchased Moran Paint in or about 1963 and continued the business of Moran Paint as a division of Carboline until on or about January 11, 1980, when Moran Paint was merged into Carboline.

33.     Moran Paint operated a paint production facility at the Site from approximately 1944 to 1951, which facility manufactured paint removers, paint thinners and paint constituents.

6

This facility also manufactured, blended and recycled solvents and stored chemicals on-Site in storage tanks.

34. Moran Paint also owned the Site property from at least 1948 to 1951.

35. Moran Paint's operations included the use of VOCs and aromatic hydrocarbons, among other compounds, which contained hazardous substances.

36. Hazardous substances from Moran Paint's operations were released at or from the Site during the time period Moran Paint owned and/or operated the Site.

37. The hazardous substances released from the Moran Paint facility include hazardous substances found in groundwater sampling results near the Moran Paint facility.

38. In 1951, Moran Paint moved from the Site and eventually relocated its manufacturing operations to Xenia, Ohio in approximately 1957.

39. Additionally, according to EPA's Waste-In List for the Site, Moran Paint by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment at the Site of at least 265,493 gallons of waste containing hazardous substances owned or possessed by Moran Paint from its Xenia, Ohio location.

40. The waste streams generated by Moran Paint at its Xenia, Ohio location included waste solvents and paint thinners and were transported to the Site in 5,000 to 6,000-gallon bulk containers picked up every five to six weeks for three to five years during the time period solvent recovery and barrel reconditioning operations were conducted at the Site.

41. EPA sent Carboline a June 27, 2001 Special Notice Letter notifying Carboline of its potential liability at the Site, demanding that Carboline reimburse EPA for its response costs

incurred to date, and encouraging Carboline to cooperate with other PRPs to fund and conduct the RI/FS which the Lammers Barrel PRP Group funded and conducted under the 2002 AOC.

42. EPA sent Carboline a General Notice Letter dated September 21, 2011 notifying Carboline of its potential liability at the Site, demanding that Carboline reimburse EPA for its response costs incurred as of August 31, 2011 plus applicable interest, and encouraging Carboline to cooperate with other PRPs at the Site.

43. EPA sent Carboline another Special Notice Letter dated May 4, 2012 containing a formal demand to Carboline to reimburse EPA for response costs it had incurred to date and requiring Carboline to participate in formal negotiations with EPA to conduct or finance the response activities required at the Site for OU1 by July 3, 2012.

44. To date, Carboline has refused to cooperate with either EPA or the Lammers Barrel PRP Group at the Site, and has not paid its equitable share of Site response costs.

45. Alternatively, Defendant Sunoco, Inc. ("Sunoco") is the successor to Moran Paint and is responsible for the waste streams attributable to Moran Paint as a Site operator and generator.

46. On or about January 21, 1980, after Moran Paint and other companies were merged into Carboline, Carboline was merged into Sun Company, Inc.

47. Sun Oil Company was incorporated in Pennsylvania in or about 1971, was renamed Sun Company, Inc. in or about 1976, and currently operates under the name Sunoco.

48. To date, Sunoco has refused to cooperate with either EPA or the Lammers Barrel PRP Group for the waste streams attributable to Moran Paint at the Site, and has not paid its equitable share of Site response costs.

49. Defendant Dayton Industrial Drum, Inc. ("Dayton Industrial Drum") is formerly known as and/or is the successor to Lammers Barrel Corporation.

50. In 1955, Lammers Barrel Corporation was incorporated in the State of Ohio.

51. In 1972, Lammers Barrel Corporation amended its Articles of Incorporation to change its name to Dayton Industrial Drum, Inc.

52. Lammers Barrel Corporation conducted solvent recovery and barrel reconditioning operations at the Site, including the purchase, storage, reclamation and sale of industrial solvents including chlorinated VOCs from about 1955 until in or about 1964.

53. The barrels acquired by Lammers Barrel Corporation during these years contained waste oils, solvents and other compounds containing hazardous substances.

54. As part of the operations of Lammers Barrel Corporation at the Site, residue waste oils, solvents and other compounds containing hazardous substances contained in these barrels would leak and/or would be dumped into a drain pit that flowed into an underground septic tank at the Site.

55. Lammers Barrel Corporation also used a rinse containing hazardous substances to clean barrels at the Site, after which the rinse water would be drained into a different septic tank that drained into a leach field at the Site.

56. Hazardous substances were released at or from the Site from the operations conducted by Lammers Barrel Corporation at the Site.

57. EPA sent Dayton Industrial Drum a June 27, 2001 Special Notice Letter notifying Dayton Industrial Drum of its potential liability at the Site, demanding that Dayton Industrial Drum reimburse EPA for its response costs incurred to date, and encouraging Dayton Industrial

Drum to cooperate with other PRPs to fund and conduct the RI/FS which the Lammers Barrel PRP Group funded and conducted under the 2002 AOC.

58. EPA sent Dayton Industrial Drum a General Notice Letter dated September 21, 2011 notifying Dayton Industrial Drum of its potential liability at the Site, demanding that Dayton Industrial Drum reimburse EPA for its response costs incurred as of August 31, 2011 plus applicable interest, and encouraging Dayton Industrial Drum to cooperate with other PRPs at the Site.

59. EPA sent Dayton Industrial Drum another Special Notice Letter dated May 4, 2012 containing a formal demand to Dayton Industrial Drum to reimburse EPA for response costs it had incurred to date and requiring Dayton Industrial Drum to participate in formal negotiations with EPA to conduct or finance the response activities required at the Site for OU1 by July 3, 2012.

60. To date, Dayton Industrial Drum has refused to cooperate with either EPA or the Lammers Barrel PRP Group at the Site, and has not paid its equitable share of Site response costs.

61. According to EPA's Waste-In List for the Site, Defendant Gem City Chemicals, Inc. ("Gem City Chemicals") by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment at the Site of at least 1,210 gallons of waste containing hazardous substances owned or possessed by Gem City Chemicals.

62. The waste streams generated by Gem City Chemicals were mixed solvents containing alcohols, ketones, aliphatics and aromatics picked up in loads of four to five drums every eight to ten weeks from Gem City Chemicals' location in Dayton, Ohio.

63. EPA sent Gem City Chemicals a June 27, 2001 Special Notice Letter notifying Gem City Chemicals of its potential liability at the Site, demanding that Gem City Chemicals reimburse EPA for its response costs incurred to date, and encouraging Gem City Chemicals to cooperate with other PRPs to fund and conduct the RI/FS which the Lammers Barrel PRP Group funded and conducted under the 2002 AOC.

64. EPA sent Gem City Chemicals a General Notice Letter dated September 21, 2011 notifying Gem City Chemicals of its potential liability at the Site, demanding that Gem City Chemicals reimburse EPA for its response costs incurred as of August 31, 2011 plus applicable interest, and encouraging Gem City Chemicals to cooperate with other PRPs at the Site.

65. EPA sent Gem City Chemicals another Special Notice Letter dated May 4, 2012 containing a formal demand to Gem City Chemicals to reimburse EPA for response costs it had incurred to date and requiring Gem City Chemicals to participate in formal negotiations with EPA to conduct or finance the response activities required at the Site for OU1 by July 3, 2012.

66. To date, Gem City Chemicals has refused to cooperate with either EPA or the Lammers Barrel PRP Group at the Site, and has not paid its equitable share of Site response costs.

67. According to EPA's Waste-In List for the Site, Defendant NCR Corporation ("NCR Corporation") by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment at the Site of at least 18,948 gallons of waste containing hazardous substances owned or possessed by NCR Corporation.

68. The waste streams generated by NCR Corporation consisted of paint solvents and cleaning chemicals picked up in drums during the relevant time period.

69. EPA sent NCR Corporation a June 27, 2001 Special Notice Letter notifying NCR Corporation of its potential liability at the Site, demanding that NCR Corporation reimburse EPA for its response costs incurred to date, and encouraging NCR Corporation to cooperate with other PRPs to fund and conduct the RI/FS which the Lammers Barrel PRP Group funded and conducted under the 2002 AOC.

70. EPA sent NCR Corporation a General Notice Letter dated September 21, 2011 notifying NCR Corporation of its potential liability at the Site, demanding that NCR Corporation reimburse EPA for its response costs incurred as of August 31, 2011 plus applicable interest, and encouraging NCR Corporation to cooperate with other PRPs at the Site.

71. EPA sent NCR Corporation another Special Notice Letter dated May 4, 2012 containing a formal demand to NCR Corporation to reimburse EPA for response costs it had incurred to date and requiring NCR Corporation to participate in formal negotiations with EPA to conduct or finance the response activities required at the Site for OU1 by July 3, 2012.

72. To date, NCR Corporation has refused to cooperate with either EPA or the Lammers Barrel PRP Group at the Site, and has not paid its equitable share of Site response costs.

73. According to Ohio Secretary of State records, Defendant Worthington Industries, Inc. ("Worthington Industries"), an Ohio corporation, was started in Columbus, Ohio in 1955 under its prior name, The Worthington Steel Company ("Worthington Steel").

74. Worthington Steel was a die, tool and machine fabricator that began brokering steel in 1955, just two years after Dayton Industrial Drum began solvent recovery and barrel reconditioning operations at the Site.

75. In 1959, Worthington Steel purchased a two-acre site north of Columbus, Ohio to house all of its operations.

76. By 1961, Worthington Steel added significant new processing capabilities with the installation of its first one pass cold rolling mill at its Columbus, Ohio facility.

77. In 1971, Worthington Steel changed its name to Worthington Industries while still operating out of the same Columbus, Ohio facility.

78. According to EPA's Waste-In List for the Site, a company with the "Worthington" name by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment at the Site of at least 10,010 gallons of waste containing hazardous substances owned or possessed by such "Worthington" company.

79. The waste streams generated by "Worthington" consisted of dirty solvents picked up in loads of eight to fifteen 55-gallon drums once every five to eight weeks during the relevant time period.

80. EPA sent Worthington Industries a June 27, 2001 Special Notice Letter notifying Worthington Industries of its potential liability at the Site, demanding that Worthington Industries reimburse EPA for its response costs incurred to date, and encouraging Worthington Industries to cooperate with other PRPs to fund and conduct the RI/FS which the Lammers Barrel PRP Group funded and conducted under the 2002 AOC.

81. In response, Worthington Industries sent EPA an August 30, 2001 letter claiming that no company operating under the name of Worthington Industries operated in Ohio until 1971. This letter fails to acknowledge that Worthington Industries' prior name for its Columbus, Ohio facility from 1955 to 1971 was Worthington Steel.

13

82. Worthington Industries' August 30, 2001 letter purposely attempted to mislead EPA to try to avoid its potential liability at the Site.

83. EPA sent Worthington Industries a General Notice Letter dated September 21, 2011 notifying Worthington Industries of its potential liability at the Site, demanding that Worthington Industries reimburse EPA for its response costs incurred as of August 31, 2011 plus applicable interest, and encouraging Worthington Industries to cooperate with other PRPs at the Site.

84. EPA sent Worthington Industries another Special Notice Letter dated May 4, 2012 containing a formal demand to Worthington Industries to reimburse EPA for response costs it had incurred to date and requiring Worthington Industries to participate in formal negotiations with EPA to conduct or finance the response activities required at the Site for OU1 by July 3, 2012.

85. To date, Worthington Industries has refused to cooperate with either EPA or the Lammers Barrel PRP Group at the Site, and has not paid its equitable share of Site response costs.

86. Defendant Yenkin-Majestic Paint Corporation ("Yenkin-Majestic") is the successor to Majestic Paint Centers, Inc. and Majestic Paint Stores, Inc. (collectively "Majestic Paint").

87. Yenkin-Majestic shared the same incorporators, operations, addresses, and corporate officers as Majestic Paint and continues to operate in the same location as Majestic Paint.

88. According to EPA's Waste-In List for the Site, Majestic Paint by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for

transport for disposal or treatment at the Site of at least 78,650 gallons of waste containing hazardous substances owned or possessed by Majestic Paint.

89. The waste streams generated by Majestic Paint consisted of waste wash solvents such as aromatics, aliphatics, ketones and alcohols picked up in drums for two to three years during the relevant time period.

90. EPA sent Yenkin-Majestic a June 27, 2001 Special Notice Letter notifying Yenkin-Majestic of its potential liability at the Site, demanding that Yenkin-Majestic reimburse EPA for its response costs incurred to date, and encouraging Yenkin-Majestic to cooperate with other PRPs to fund and conduct the RI/FS which the Lammers Barrel PRP Group funded and conducted under the 2002 AOC.

91. EPA sent Yenkin-Majestic a General Notice Letter dated September 21, 2011 notifying Yenkin-Majestic of its potential liability at the Site, demanding that Yenkin-Majestic reimburse EPA for its response costs incurred as of August 31, 2011 plus applicable interest, and encouraging Worthington Industries to cooperate with other PRPs at the Site.

92. EPA sent Yenkin-Majestic another Special Notice Letter dated May 4, 2012 containing a formal demand to Yenkin-Majestic to reimburse EPA for response costs it had incurred to date and requiring Yenkin-Majestic to participate in formal negotiations with EPA to conduct or finance the response activities required at the Site for OU1 by July 3, 2012.

93. To date, Yenkin-Majestic has refused to cooperate with either EPA or the Lammers Barrel PRP Group at the Site, and has not paid its equitable share of Site response costs.

## FIRST CLAIM FOR RELIEF
## CONTRIBUTION UNDER CERCLA

94. The Lammers Barrel PRP Group realleges and incorporates by reference Paragraph Nos. 1 through 93 of this Complaint as if fully restated herein.

95. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

96. Hazardous substances have been released or are threatened be released into the environment from the Site which have contaminated or will contaminate the environment, including soils, surface waters, and groundwater, within the meaning of CERCLA, 42 U.S.C. §§ 9601(8), 9601(14) and 9601(22).

97. The release and/or threatened release of hazardous substances have caused the Lammers Barrel PRP Group to incur and continue to incur response costs, within the meaning of CERCLA, 42 U.S.C. § 9601(25), including costs to assess, monitor, evaluate, oversee and conduct remedial and removal actions in response to the release and threatened release of hazardous substances.

98. The response costs mentioned above are costs of removal or remedial action within the meaning of CERCLA, 42 U.S.C. §§ 9601(23), (24), (25), (31) and 42 U.S.C. § 9607(a). The Lammers Barrel PRP Group is entitled to recover all such response costs from responsible persons as they were incurred for removal and remedial actions not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 CFR Part 300.

99. Pursuant to CERCLA, 42 U.S.C. § 9607(a), Defendants are liable as arrangers or generators of materials containing hazardous substances, which materials were disposed of at the Site; and/or past owners and/or operators of the Site during a time period when hazardous substances were disposed of at the Site.

100. Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . .
>
> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement . . . .

101. The Lammers Barrel PRP Group members have resolved their liability to the United States for matters covered in the underlying action.

102. All Defendants are liable parties under CERCLA, but have not resolved their liability to the United States, the Lammers Barrel PRP Group or any other entities.

103. The Lammers Barrel PRP Group is entitled to contribution from all Defendants under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for Defendants' respective equitable shares of all costs and damages incurred by the Lammers Barrel PRP Group, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, the Lammers Barrel PRP Group respectfully requests that this Court enter judgment pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), in favor of the Lammers Barrel PRP Group and against all Defendants holding all Defendants liable for their respective fair and equitable share of the response costs incurred or to be incurred by the Lammers Barrel PRP Group, plus all pre-judgment interest, in connection with the release and/or threatened release of hazardous substances at the Site. The Lammers Barrel PRP Group further requests that this Court award interest and costs of suit, including reasonable attorneys' fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and proper under the circumstances.

## SECOND CLAIM FOR RELIEF
## DECLARATORY RELIEF UNDER CERCLA

104. The Lammers Barrel PRP Group realleges and incorporates by reference Paragraph Nos. 1 through 103 of this Complaint as if fully restated herein.

105. There is a present and actual controversy between the Lammers Barrel PRP Group and all Defendants concerning their respective rights and obligations with respect to the response costs associated with the Site.

106. Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides, in relevant part, that:

> In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

107. The Lammers Barrel PRP Group seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against all Defendants holding them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

108. The Lammers Barrel PRP Group is further entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, declaring the Lammers Barrel PRP Group's rights against all Defendants.

109. The Lammers Barrel PRP Group is entitled to judgment against all Defendants for past and future response costs incurred in connection with the Site.

WHEREFORE, the Lammers Barrel PRP Group respectfully requests that this Court enter a declaratory judgment against all Defendants finding that they are each liable under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201 and 2202, and are obligated to pay for their equitable shares of all past and future response costs, plus interest, associated with the Site. The Lammers Barrel PRP Group further requests that this Court award interest and costs of suit, including reasonable attorneys' fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and proper under the circumstances.

Dated:   April 21, 2017                                  Respectfully submitted,


/s/ Daniel A. Brown
Daniel A. Brown (Ohio Registration # 0041132)
BROWN LAW OFFICE LLC
204 S. Ludlow Street, Suite 300
Dayton, Ohio  45402
(937) 224-1216  phone
(937) 224-1217  fax
dbrown@brownlawdayton.com

ATTORNEYS FOR PLAINTIFF LAMMERS BARREL PRP GROUP