IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LAMMERS BARREL PRP GROUP, | ) | CASE NO. 3:17-cv-00135-WHR |
| | ) | |
| Plaintiff, | ) | JUDGE WALTER H. RICE |
| | ) | MAGISTRATE JUDGE SHARON L. |
| v. | ) | OVINGTON |
| | ) | |
| CARBOLINE COMPANY, *et al.* | ) | **ETC SUNOCO HOLDINGS, LLC** |
| | ) | **F/K/A SUNOCO, INC.'S AND** |
| Defendants. | ) | **CARBOLINE COMPANY'S** |
| | ) | **MOTION *IN LIMINE* TO EXCLUDE** |
| | ) | **OPINIONS OF PLAINTIFF'S** |
| | ) | **EXPERTS** |

# Exhibit B – Excerpts from the Deposition of Matthew Low

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF OHIO
3                   WESTERN DIVISION
4
5   LAMMERS BARREL PROPERTY GROUP
6      Plaintiff              *
7   V.                        *  Civil No.: 3:17-cv-00135-WHR
8   CARBOLINE COMPANY, et al. * Judge Walter H. Rice
9      Defendants             *
10  ---------------------------------------------
11
12     DEPOSITION OF:
13
14             30(b)(6) MATTHEW LOW
15  was held on Friday, June 7, 2019, commencing at 9:35
16  a.m., at the offices of Calfee, Halter & Griswold, LLP,
17  1627 I Street, Northwest, Suite 1120, Washington, D.C.,
18
19
20  Job Number:  3407158
21
22  Reported by:  Stacey Lawson, Court Reporter

Page 82

1  Q.  Did he give you comments?
2  A.  I believe he may have, yes.
3  Q.  Did he change your opinions in any material
4  way?
5  A.  No.
6  Q.  Do you recall what nature of those comments
7  were?
8  A.  They were probably largely editorial.  I don't
9  recall any specific comments that made me change my
10 report.
11 Q.  Did he give you any comments on Moran Paint?
12 A.  Not that I recall.
13 Q.  When you prepared your report or in the process
14 of being engaged to prepare your report, did anybody
15 give you any instructions about areas you should not
16 treat or conclusions you should not reach?
17 A.  No.
18 Q.  Any conclusions you should be sure to treat or
19 reach?
20 A.  No.
21 Q.  Now, as you indicated at page 12 of your report,
22 at the top first paragraph you write:  In 2012 I

Page 83

1  performed an allocation analysis that resulted in a
2  number of generator parties settling their liabilities
3  with EPA.  Do you see that?
4     A.    Yes.
5     Q.    "For the purpose of this report, I have adopted
6  the analysis I performed in 2012 and the resulting
7  generation allocation percentages produced by that
8  analysis."  And then you indicate a correction, a minor
9  correction for NCR?
10    A.    That's correct.
11    Q.    So would it be fair to say to that the report
12 that you prepared for purposes of this case derives from
13 your 2012 work?
14    A.    Yes.
15    Q.    In 2012, you did no owner/operator allocation
16 with respect to the contamination, correct?
17    A.    That's correct.
18    Q.    Why not?
19    A.    I wasn't asked to.
20    Q.    Did you ask to do one?
21    A.    Not that I recall.
22    Q.    Did you have any discussion as to why an

Page 96

1  that give and the TechLaw title documents what were the
2  operations alleged to have occurred at the Moran Paint
3  company in the late 40s.  Do you see that language?
4       A.    Yes, I do.
5       Q.    "From the dates of ownership, it is not clear
6  when Moran Paint began and ceased operations on the site
7  but it appears it operated the site from at least 1948
8  to at least 1951."  Do you see that language?
9       A.    Yes.
10      Q.    Now, you go to say that in his Rule 27
11 deposition testimony, Mr. Kohnen indicated that he
12 employed Moran Paint Company during that time period.
13            Do you see that?
14      A.    Yes.
15      Q.    You don't give a specific citation.  But it's
16 true is it not that Mr. Kohnen testified that he did not
17 start working at the site until 1950.
18            Do you recall that?
19      A.    No.
20      Q.    You don't recall that.
21            Then you go on to write:  Again, citing his
22 testimony, that he stated that the company manufactured

Page 97

1  paint lacquers and paint removers at the site.  The
2  paint removers were supplied under contract of the U.S.
3  Air Force for the use in the removal of camouflage paint
4  for military aircraft.  Do you see that language?
5      A.    Yes.
6      Q.    You're relying exclusively on Mr. Kohnen's
7  testimony for those propositions, correct?
8      A.    That's my recollection.
9      Q.    You have not seen any contract documents that
10 indicated that Moran Paint had an Air Force contract for
11 paint removal, have you?
12     A.    I have no recollection of seeing a contract.
13     Q.    Now, he goes on to talk about paint
14 manufacturing across the street, and listing what he
15 thought were the raw materials that you described in the
16 last paragraph, the sentence of the paragraph:
17 Pigments.  Plasticizers.  Nitrocellulose products.  Tar.
18 Tar oil.  Solvents, including mineral spirits.  Stoddard
19 solvents.  Alcohol.  Keytones and Aliphatics.  Aliphatic
20 and Aromatic Hydrocarbons were used in the paint
21 manufacturing operations.  And you cite again to Mr.
22 Kohnen's testimony.  Do you see that?

1   A.   Yes.
2   Q.   No where in that list does there appear a
3   chlorinated volatile organic compound.
4        Is that correct?
5   A.   That's correct.
6        The term solvents in that sentence could
7   include chlorinated solvents, but it is not specified as
8   such.
9   Q.   And he did not specify any in his testimony, did
10  he?
11  A.   Not that I recall.
12  Q.   Now, in the last paragraph on the page you
13  write:  After Moran Paint moved its operations from the
14  site to Xenia, Ohio, it sent significant amounts of
15  paint thinner to the site solvent reclamation, and also
16  upon sent barrels to the site for reconditioning.
17       Do you see that language?
18  A.   Yes.
19  Q.   You give no citation for it.  On what did you
20  base your belief that it sent significant amounts of
21  waste solvents or paint?
22  A.   I believe there was testimony to that effect.

Page 100

1  2018, correct?
2      A.    Yes.
3      Q.    And that's what you have corrected by virtue of
4  what you served today as being inaccurate.  In fact,
5  that you did include that volume in their allocation,
6  correct?
7      A.    Yes.
8      Q.    You made reference to when I asked what was
9  citation or source for your first sentence in the last
10 paragraph of page 5 of Exhibit 4, you referred me to the
11 Moran paint description on page 21 and 22 talking about
12 the Kohnen and Brown testimony.
13           But you also referred me something in Exhibit
14 2, what was that, attachment 2 rather?
15     A.    Well, I think attachment 2 includes the volume
16 calculations that were made for each of parties
17 including Moran Paint.
18     Q.    And that is what came from the Kohnen and Brown
19 depositions, correct?
20     A.    Yes.
21     Q.    Any other source for Moran Paint in Exhibit 2?
22     A.    I don't believe so.