IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LAMMERS BARREL PRP
GROUP,
      Plaintiff,

      v.

CARBOLINE COMPANY, et al.,
      Defendants.

:

:

:

:

Case No. 3:17-cv-00135

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT DAYTON INDUSTRIAL DRUM, INC.
(DOC. #61); OVERRULING AS MOOT PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DAYTON
INDUSTRIAL DRUM (DOC. #64); AND SUSTAINING MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT WORTHINGTON
INDUSTRIES, INC. (DOC. #67); CONFERENCE CALL SET FOR
TUESDAY, APRIL 14, 2020, AT 4:30 P.M.

---

Plaintiff, Lammers Barrel PRP Group ("PRP Group" or "Plaintiff"), sued

several defendants, including Dayton Industrial Drum, Inc. ("DID") and

Worthington Industries, Inc. ("Worthington Industries"), under the Comprehensive

Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as

amended, 42 U.S.C. §§ 9601 et seq., seeking contribution under § 113(f), 42 U.S.C.

§ 9613(f), and declaratory relief under § 113(g)(2), 42 U.S.C. § 9613(g)(2). Doc. #1.

The PRP Group alleges that DID, Worthington Industries and others are liable to it

for past and/or future response costs incurred by them in connection with the

Lammers Barrel Factory Superfund Site ("Site").

Pursuant to the Court's Preliminary Pretrial Order, Doc. #56, discovery has been completed. This matter is before the Court on DID's Motion for Summary Judgment, Doc. #61, Plaintiffs' Motion for Partial Summary Judgment against DID, Doc. #64, and Worthington Industries's Motion for Summary Judgment, Doc. #67.

## I.     Background and Procedural History

The Site, located at the intersection of Grange-Hall Road and East Patterson Road in Beavercreek, Greene County, Ohio, consists of approximately 2.5 acres with a creek running east to west through the center. Doc. #1, PAGEID#2. From approximately 1944 until 1969, there were several industrial operations at the Site including the Moran Paint Company and Lammers Barrel Corporation. *Id.*, PAGEID#9. According to the Complaint, the "Lammers Barrel Corporation conducted solvent recovery and barrel reconditioning operations at the Site, including the purchase, storage, reclamation and sale of industrial solvents including chlorinated VOCs [volatile organic compounds] from about 1955 until in or about 1964." *Id.* Plaintiff alleges that "[H]azardous substances were released at or from the Site from the operations conducted by Lammers Barrel Corporation." *Id.*

On or about September 30, 1969, an explosion and fire destroyed the building located at the Site along with everything that was stored there. *Id.*, PAGEID#3.

In March of 1972, approximately three years after the fire at the Site, the stock of Lammers Barrel Corp. was purchased by a group of investors and the name was changed to DID. Doc. #61-1, PAGEID486. DID operated in Dayton, Ohio, from 1972 through December 2017. Doc. #61-20, PAGEID##686-687.

With respect to Worthington Industries, the PRP Group alleges that this Defendant was formerly known as the Worthington Steel Company, a tool, die and machine fabricator in Columbus, Ohio, and that it first began brokering steel in 1955. Doc. #1, PAGEID#12. In 1959, the company purchased a two-acre site in Columbus and by 1961 it had "new processing capabilities with the installation of its first one pass cold rolling mill" at its Columbus location. Doc. #1, PAGEID#13. In 1971, the Worthington Steel Company changed its name to Worthington Industries, Inc. *Id.* According to the EPA's Waste-In List for the Site, "a company with the 'Worthington' name by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment at the Site of at least 10,010 gallons of waste containing hazardous substances owned or possessed by such 'Worthington' company." *Id.* The waste generated by "'Worthington' consisted of dirty solvents picked up in loads of eight to fifteen 55-gallon drums once every five to eight weeks during the relevant time period." *Id.*

In late 1985, wells in the vicinity of the Site were found to be contaminated with VOCs. *Id.*, PAGEID#3. In 1986, the EPA completed a Removal Action with nine residences connected to an existing water main. Four additional homes were

later connected to the County water supply in 2000. Doc. #61-3, PAGEID#511. Following this discovery in 1986, the United States Environmental Protection Agency ("EPA") conducted various response activities and under a 2002 Administrative Order on Consent for Remedial Investigation("RI")/Feasibility Study ("FS") ("2002 AOC"), Plaintiff and others agreed to examine ways to remedy the contamination at the Site, as well as to reimburse oversight costs incurred by the EPA and the Ohio EPA. Doc. #1, PAGEID#3. Thereafter, the Site was divided into two parts: Operable Unit 1 ("OU1"), for the on-site soil and groundwater contamination, and Operable Unit 2 ("OU2"), for the off-Site groundwater contamination. The Site was placed on the National Priorities List, and in August 2008 the parties to the AOC completed, and the EPA approved, the RI for the Site. *Id*.

On or about June 30, 2011, the respondents to the 2002 AOC completed, and the EPA approved, the Operable Unit 1 Feasibility Study ("OU1 FS"). Based on the information collected in the RI and the OU1 FS, the EPA selected a remedy for OU1 in a Record of Decision ("OU1 ROD"), issued by the EPA on September 27, 2011. *Id*.

Additional investigation of the contaminated groundwater plume and the Operable Unit 2 Feasibility Study ("OU2 FS") is ongoing. *Id*.

On or about May 4, 2012, EPA, the Lammers Barrel PRP Group and others began negotiating a Remedial Design/Remedial Action ("RD/RA") Work Plan to implement the OU1 ROD. These negotiations were completed on July 31, 2013.

4

As a result of the VOC contamination at the Site, the United States filed a Complaint, under §§ 106,107 and 113 of CERCLA, on January 31, 2014, against the PRP Group and others entitled *United States v. 3M Company*, et al., No. 3:14-cv-32. *Id.*, PAGEID#5. On April 22, 2014, this Court entered the Remedial Design/Remedial Action ("RD/RA") and De Minimis Consent Decree between the EPA and Plaintiffs, along with several non-performing settling defendants ("2014 CD").[1] *Id.* According to the 2014 CD, the PRP Group was required to pay certain EPA past response costs and to perform the response cost activities by the OU1 ROD at the Site.

On August 2, 2016, the United States of America sued DID and Sunoco, Inc., pursuant to § 107(a) of CERCLA, in order to recover unreimbursed costs incurred by the United States for response activities undertaken due to "the release or threatened release of hazardous substances from facilities" at and near the Site. *United States of America v. Dayton Industrial Drum, Inc.*, et al., Case No. 3:16-cv-232 (S.D. Ohio June 10, 2016) ("2016 DID Cost Recovery Case"). The suit also sought a declaratory judgment against DID and Sunoco, seeking joint and several liability for any further response costs that may be incurred and not otherwise reimbursed.

On April 21, 2017, the PRP Group filed this action against DID, Worthington Industries and several other defendants seeking contribution, under CERCLA,

---

[1] The Complaint incorrectly alleges that the 2014 CD was entered by this Court on May 8, 2014.

§ 113(f), for Plaintiff's share of the response costs incurred or to be incurred by them in connection with the release or threatened release of hazardous substances at the Site. As of the filing of this Complaint, Plaintiff has allegedly incurred over $6 million in response costs and "will continue to incur millions of additional dollars of response costs to perform the various response costs activities at the Site." Doc. #1, PAGEID#5. Additional investigation of a contaminated groundwater plume that migrates off-Site to the east ("OU2"), is the subject of the ongoing Feasibility Study.

Worthington Industries filed an answer, Doc. #15, denying that it ever generated and/or transported hazardous substances which were disposed at the Site. DID filed both an answer denying liability and a counterclaim seeking contribution under § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B) and § 113(f)(1), 42 U.S.C. § 9613(f)(1). Doc. #29.

On August 13, 2018, the United States of America filed a Federal Debt Collection Procedures Act suit, 28 U.S.C. §§ 3301-3308, against DID and others as a result of a December 2017, asset purchase agreement for the sale of DID's assets. *United States of America v Dayton Industrial Drum, Inc.*, et al, Case No. 3:18- cv-271 (S.D. Ohio August 13, 2018) ("FDCPA Case"). The Defendants, including DID, filed a motion to dismiss, following which the parties agreed to a stay of the proceedings, without the Court having ruled on the motion.

On July 3, 2019, DID paid $825,000 to the United States and entered into a Consent Decree ("2019 CD") in the 2016 DID Cost Recovery Case, Doc. #56,

PAGEID#805. Of the money paid by DID, $762,000 was deposited by the EPA in the Lammers Barrel Site Special Account and $63,000 was deposited by the EPA in the Lammers Barrel OU2 Special Account. *Id*. The 2019 CD resolved all of DID's "liability to the United States within the meaning of § 113(f)(2) of CERCLA" and provided "protection from contribution actions or claims as provided by § 113(f)(2) of CERCLA" for the "matters addressed" in the decree. *Id*., PAGEID#809. The 2019 CD defined the "matters addressed," for the purpose of protection from contribution actions or claims, as the OU2 RD/RA costs. *Id*. The FDCPA Case was also dismissed. The 2019 CD did not provide contribution protection against the PRP Group's claims for the past costs and future response costs incurred and to be incurred by Plaintiff for the OU1 and OU2 RI/FS or the OU1 RD/RA at the Site. 2016 Cost Recovery Case Doc. #55-1, PAGEID#796. Accordingly, left unresolved in the 2019 CD is "whether DID has borne its fair share of Lammers Barrel Site costs. (citation omitted)." *Id*. at PAGEID#797. The 2019 CD did "not settle that debate; it leaves that as an issue for this Court to decide" in this case. *Id*.

The Court will first address DID's motion for summary judgment and Plaintiff's motion for partial summary judgment against DID on the issue of liability. The Court will then consider the motion for summary judgment filed by Worthington Industries.

## II.    Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a

8

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998). In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.  DID'S Motion for Summary Judgment (Doc. #61)

### A. Introduction

DID's argues that its motion for summary judgment should be sustained because it has "paid well beyond its equitable share of liability at the Site." In making this argument, DID does not challenge whether the PRP Group established a *prima facie* case for cost recovery under 42 U.S.C. § 9607(a), rendering DID strictly liable for response costs.  *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000) (parties seeking contribution under § 113 must look to § 107 to establish the basis and elements of the liability of the defendants). *Reg'l Airport Auth. Of Louisville v. LFG*, LLC 460 F.3d 697, 703 (6th Cir. 2006). Instead, DID asserts that based upon the common liability of the parties for the clean-up at the Site and DID's settlement with the United States as set forth in the 2019 CD, Plaintiff has no claim for contribution under CERCLA § 113(f).  Doc. # 61, PAGEID#477.

Specifically, DID contends that its motion for summary judgment is supported by the following undisputed facts: (1) the common liability of the PRP Group and DID under CERCLA § 107(a) for past and future response actions for the RI/FS and the OU1 RD/RA work at the Site is $10,357,530,[2] (2) Plaintiff's

---

[2] Total past and future estimated costs for the RI/FS at the Site and the OU1 RD/RA total $9,507,530. Doc. #61-17, PAGEID#660; Doc. #61-1, PAGEID#480.  Under the terms of the 2014 CD, the PRP Group reimbursed all of the government's response costs except approximately $850,000 ($9,507,530 + $850,000 = $10,357,530). Doc. 77-3, PAGEID#2649; Cost Recovery Case, Doc. #54-3, PAGEID#781. Although Plaintiff's response, Doc. #69, does not state any specific dollar amount of the costs incurred at the Site for the RI/FS

allocation expert, Matthew A. Low, determined that an equitable allocation for DID, including any orphan share, is 2.05% or $212,329 and (3) pursuant to the terms of the 2019 CD, DID paid $762,000 to the Lammers Barrel Site Special Account (with an additional $63,000 for the OU2 RA/RD). DID argues that the $762,000 is more than 7.3% of the total common costs as opposed to the 2.05% which Plaintiff's expert opined was attributable to DID. As such, DID argues that Plaintiff no longer has any claim for contribution to assert.

The PRP Group's response to DID's motion for summary judgment does not contest that the amount of the common liability is $10,357,530, that their expert determined that DID's share was 2.05% or that they paid to the government $762,000 for the RI/FS and the OU1 RD/RA work at the Site. Plaintiff does, however, argue that DID's motion for summary judgment should be overruled, since the 2019 CD did not give statutory contribution protection to DID for the RI/FS and OU1 RD/RA costs at the Site, and DID's payment of $762,000 to the government does not offset the past or future Site costs that Plaintiff has incurred. The PRP Group further argues that there is a factual dispute between the parties' experts on the amount of the base allocation percentages for DID and that the PRP Group does not take into consideration any increase due to Plaintiff's recalcitrance

---

and the OU1 RD/RA, the government, in its affidavit in support of motion to re-affirm consent decree, testified that $9,507,530 was the dollar amount used in a mediation session and that Plaintiff "consented to the filing of this document [setting forth the $9,507,530 amount] as part of this Motion to [Re-Affirm Entry]." Doc. 54-3.

or lack of cooperation with Federal, State, or local officials to prevent any harm to the public health or the environment. Doc. #69, PAGEID##1735-1742.

Before considering the arguments of the parties, the Court will first review the relevant law concerning the allocation of costs under CERCLA § 113(f), 42 U.S.C. § 9613(f).

### B. Cost Allocation Under a § 113(f) Contribution Claim

Although CERCLA "creates a complicated network of cost-shifting provisions," where a party is sued by the government under CERCLA §§ 106 or 107, 42 U.S.C. §§ 9606 and 9607(a), that party may seek contribution from other PRPs under § 113(f)(1) so that the recovery costs can be distributed in an equitable fashion. *Hobart Corp. v. Waste Management of Ohio, Inc.*, 758 F.3d 757 (6th Cir. 2014) (citing *Cooper Indus., Inc. v. Aviall Servs., Inc.* 543 U.S. 157, 165-166 (2004). Section 113(f)(2), 42 U.S.C. 9613, addresses the effect that a settlement has on claims of contribution.

> [A] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

Moreover, the right to contribution granted under § 113(f) is in the "traditional sense." *U.S. v. Atlantic Research Corp.,* 551 U.S. 128, 138 (2007). "Contribution is defined as the 'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her

proportionate share, the shares being determined as a percentage of fault.'" *Id.* (citing Black's Law Dictionary 353 (8th ed. 2004).

Although causation is not an element in establishing a defendant's liability in a contribution claim, (not at issue in DID's motion for summary judgment), it is an element in allocating response costs. *Kalamazoo River Study Group*, 228 F.3d at 656-57. In resolving CERCLA contribution claims, the district court has "broad discretion" in making allocations, *U.S. v Consolidation Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003), and § 113(f) claims are to be resolved by the Court using "such equitable factors as the Court determines are appropriate." 42 U.S.C. § 9613(f). In this regard, the Sixth Circuit has given the district courts much discretion. Specifically, neither the "six so-called 'Gore factors' considered by Congress in enacting" CERCLA,[3]" nor the "four 'critical factors' identified by Judge Torre in *United States v. Davis*, 31 F.Supp.2d 45, 63 (D.R.I.1998), aff'd, 261 F.3d 1 (1st Cir.2001)[4]" . . . is "intended to be exhaustive or exclusive." *Consolidation Coal*

_____

[3] The Gore factors consist of the following: 1. the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; 2. the amount of hazardous waste involved; 3. the degree of toxicity of the hazardous waste; 4. the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; 5. the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and 6. the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment. *Allied Signal v. Amcast Intern. Corp.* 177 F. Supp.2d 713 (S.D. OH. 2001)(citing *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 935 (8th Cir. 1995).

[4] The "four critical factors" identified in *United States v. Davis*, 31 F. Supp. 2d at 63 (2001) are the following: (1) the extent to which cleanup costs are attributable to wastes for which a party is responsible; (2) the party's level of culpability; (3) the degree to which

*Co.*, 345 F.3d at 413; *Responsible Environmental Solutions Alliance v. Waste Management, Inc.*, 2011 WL 382617 No. 3:04cv013 *10 (S.D. Ohio Feb. 3, 2011 (*"RESA"*).

### C. Equitable Allocation of Costs

The issue before this Court is whether the PRP Group has the right to collect from DID, under a CERCLA § 113(f) contribution action, after DID settled and paid the United States pursuant to the 2019 CD. Inasmuch as the amount of the common liability for the costs incurred at the Site, the base allocation percentage found by Plaintiff's expert and the amount of the settlement payment made by DID pursuant to the terms of 2019 CD are not in dispute, the Court must consider whether Plaintiff has raised any genuine dispute of material fact that prevents the granting of DID's motion for summary judgment as a matter of law. In this regard, Plaintiff makes four arguments opposing DID's motion for summary judgment, which the Court will now review.

Plaintiff first argues that DID's motion for summary judgment should be overruled since the 2019 CD only provided contribution protection for the costs associated with the OU2 RD/RA. As such, according to the PRP Group, contribution liability under CERCLA § 113 exists for all other costs that it incurred or will incur at the Site and the settlement monies paid by DID to the government

---

the party benefitted from disposal of the waste; and (4) the party's ability to pay its share of the cost.

14

cannot be considered.[5] Related to this argument is the PRP Group's second argument that DID's motion must be overruled because Plaintiff will receive no benefit from DID's settlement payment to the government. While both of these arguments may be factually correct, since the 2019 CD only gives contribution protection to the OU2 RD/RA costs and the $762,000 payment was made to the United States, neither of these arguments addresses whether DID has paid its fair and equitable share of the total common costs incurred or to be incurred by Plaintiff at the Site. Although "[S]ection113(f) explicitly grants PRPs a right to contribution," *Atlantic Research Corp.*, 551 U.S. 139 (2007), "[A] PRP's right to contribution under [CERCLA] is contingent upon an inequitable distribution of common liability among liable parties." *Id.* at 138-39. Moreover, CERCLA § 113 provides that "[i]n resolving contribution claims, a court may allocate response costs among the liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Plaintiff's argument, that DID's motion for summary judgment must be overruled because the 2019 CD does not provide contribution protection beyond the OU2 RD/RA, fails to address whether DID has paid in excess of their "own equitable share of liability" for the

---

[5] Plaintiff's argument that DID remains liable under § 113 for contribution because the language of the 2019 CD did not give DID protection for the RI/FS costs and the OU1 RA/RD costs was previously made by the PRP Group and addressed by the government during the 30-day public comment period. "The PRP Group goes too far in asking the United States to rule out the possibility the amount paid to the United States could be considered in assessing the PRP Group's contribution claims against DID merely because DID did not receive contribution protection for all Site costs. (citations omitted) 2016 Cost Recovery Case, Doc. #55-1, PAGEID##796

Site. *U.S. v. R.W. Meyer, Inc.*, 932 F.2d 568, 577-78 (6th Cir. 1991(summary judgment on cross-claims for contribution apportioning one-third of cleanup cost to property owner affirmed on appeal since, as established by a fair reading of the facts, contribution ordered by the court arguably reflected the relative fault of each of the parties). Similarly, simply because Plaintiff may not receive any monetary benefit from DID's settlement with the government does not establish that there has been an inequitable distribution under CERCLA § 113, since "[N]o tortfeasor can be required to make contribution beyond his own equitable share of the liability." *Id.*, (citing 4 Restatement (Second) of Torts § 886A (1982)).

The PRP Group next argues that there are "a plethora of disputed facts and opinions that the Court needs to resolve at trial" since DID is "contesting the opinions of Plaintiff's two experts." Doc. #69, PAGEID# 1738. Admittedly, DID argues factual issues in its motion for summary judgment, including that the "catastrophic fire that occurred in September 1969" at the Site was the cause of contamination and that its own expert, Michael Woodruff, has provided the correct base allocation percentage for DID of 0.22%. Doc. 61-1, PAGEID##484 and 493. DID, however, also accepts, for purposes of this motion, the base allocation percentage of 2.05% provided by Plaintiff's expert, Matthew A. Low. Doc. #61-1, PAGEID##496-97; Doc. #77, PAGEID#2607. Because DID has adopted the base allocation percentage of 2.05% utilized by Plaintiff's expert in making its argument that DID has paid in excess of its equitable share of liability at the Site, the Court

rejects Plaintiff's argument that "a plethora of disputed facts and opinions" exist that need to be resolved at trial.

The PRP Group's final argument is that because the Court has the authority, under CERCLA § 113(f)(1), to use "such equitable factors" as it determines are appropriate, DID's allocation should be enhanced because DID has not cooperated "with Federal, State, or local officials to prevent any harm to the public health or the environment." *Control Data Corp.* 53 F.3d at 935 (8th Cir. 1995). In support of this argument, the PRP Group cites to *RESA* and *United States v. Consolidation Coal Co.*, 345 F.3d 409, 414-415 (6th Cir. 2003). Neither of these cases, however, justify an enhancement to DID's equitable share.

The PRP Group asserts that the court in *RESA* applied the Gore factors and increased the defendant's costs by a "full 34.5% due in part to a 'recalcitrance penalty.'" Doc. #69, PAGEID#1741. Although the plaintiff in *RESA* argued that the defendant, Chemical Waste Management ("CWM"), should pay 75% of the RI/FS, a 60% equitable share and a 15% recalcitrance penalty and CWM argued that it should pay only 15% of the cost of the RI/FS, the court did not order any "recalcitrance penalty." Instead, the court reviewed and considered a joint notice regarding witnesses, stipulation of facts, memoranda and arguments of counsel and ultimately rejected the proposed figures. The court allocated to CWM and to the plaintiff "equitable shares of the response costs," *Id.* *5, due to the fact that CWM was the successor-in-interest to the owner and operators at the site. In fact,

the *RESA* court considered and rejected the plaintiff's "request to adjust CWM's equitable share upward from 50%." *Id.* at *11.

The second decision Plaintiff cites in support of an enhancement to DID's base allocation percentage for allegedly not cooperating "with Federal, State, or local officials to prevent any harm to the public health or the environment" is *Consolidation Coal Co.*, 345 F.3d at 409. In *Consolidation Coal Co.*, although the Sixth Circuit vacated and remanded the case due to an improper calculation of prejudgment interest, it affirmed Judge Smith's equitable allocation, including an enhancement of defendant Neville Chemical due to its lack of cooperation with the OEPA and the EPA. Specifically, the Sixth Circuit noted that the district court found that this defendant

> did not participate in any efforts of the other PRPs to work with the government to investigate the site, design a remedy,[or] abide by the remedy. In sum, the district court found that 'Neville did not meaningfully cooperate in any phase of the CERCLA process in this case, although it was given ample opportunity to do so.' Because of this 'persistent, pervasive, and unjustified' lack of cooperation when Neville Chemical knew or should have known that its sludge had been deposited at the site, the court doubled the company's share of response costs from 3% to 6%.

345 F.3d at 413.

Importantly, Judge Smith found that Neville Chemical provided "incomplete, evasive, and misleading" answers to the government, failed to provide documents that were in its possession to the state and federal environmental agencies and responded to discovery in a way that was

determined by the district court to be "evasive and untruthful." *United States v. Consolidation Coal Co.*, 184 F. Supp. 2d 723 (S.D. Ohio 2002).

In this case, however, although DID did not join the PRP Group and was ultimately sued by the government in the 2016 Cost Recovery Case, there is no evidence that DID engaged in "evasive and untruthful" conduct with "misleading" answers to the federal, state or local government.[6]  According to DID, it did not join the PRP Group, in part, based upon its belief that there was no proof that their predecessor, Lammers Barrel Corp., was responsible for any release of hazardous chemicals, as well as the failure of Plaintiff's experts to consider that the 1969 fire, which occurred more than six years after Lammers Barrel left, was the cause of the release.  Doc. 61-1, PAGEID#481.  Finally, DID argues that due to its relatively small base allocation percentage, 2.05%, an enhancement is not justified. *AlliedSignal, Inc. v. Amcast Intern. Corp.*, 177 F. Supp.2d 713 (S.D. Ohio 2001) ((Rice, C.J.)(no increased share of liability for the defendant under the sixth Gore factor where the plaintiff was responsible for the overwhelming majority of hazardous substances, while the defendant's waste was overwhelmingly inorganic sand which posed no risk to the environment and had a small PAH content.)

_____

[6] Although the United States filed the FDCPA lawsuit against DID and others due to a December 2017 asset purchase agreement for the sale of DID's assets, the complaint did not concern DID's failure to cooperate "with Federal, State, or local officials to prevent any harm to the public health or the environment," *Control Data Corp.* 53 F.3d at 935 (8th Cir. 1995). Accordingly, the Court will not consider the FDCPA lawsuit for purposes of enhancement of the base allocation percentage.

Although the Court has the authority under CERCLA 113(f)(1) to use "such equitable factors" as it determines appropriate, neither *RESA* nor *Consolidation Coal* support increasing DID's share of liability from the base allocation of 2.05%.

### D. Summary

For the reasons set forth above, the Court SUSTAINS DID's Motion for Summary Judgment, Doc. #61. No reasonable factfinder could conclude (1) that DID has not paid its proportionate share of the common liability for the Site and (2) that Plaintiff has a claim against this Defendant under CERCLA § 113(f) for contribution. Based on this decision, DID's counterclaim for contribution or indemnification is moot and is dismissed.

### IV. Plaintiff's Motion for Partial Summary Judgment as to Liability (Doc. #64)

Plaintiff has filed a Motion for Partial Summary Judgment as to liability against DID with the allocation of DID's equitable share of response costs to be determined at a later date, Doc. #64. Plaintiff argues that because there is no question that DID is liable under CERLA, this Court should enter an order granting Plaintiff's motion for summary "with allocation reserved for a later phase of trial." For the reasons previously discussed in this Decision and Entry, Plaintiffs' Motion for Partial Summary Judgment as to Liability against DID, Doc. #64, is overruled as moot.

**V.    Worthington Industries' Motion for Summary Judgment (Doc. #67)**

**A.  Arranger Liability Under CERCLA**

The PRP Group alleges that Worthington Industries is liable for contribution

under CERCLA § 113(f) because it was an arranger as defined by 42 U.S.C.

§ 9607(a)(3). Doc. #1, PAGEID#13.  In order to prove its claim for contribution

under § 113(f), however, Plaintiff must first establish a *prima facie* case for cost

recovery liability under 42 U.S.C. § 9607(a).  *Kalamazoo River Study Group* 228

F.3d at 653.

> In order to establish a *prima facie* case for cost recovery under
> § 107(a), a plaintiff must prove four elements: (1) the site is a 'facility';
> (2) a release or threatened release of hazardous substance has
> occurred; (3) the release has caused the plaintiff to incur 'necessary
> costs of response'; and (4) the defendant falls within one of the four
> categories of PRPs.[7]

*Id.*, (quoting *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344,
347–48 (6th Cir.1998).

Under CERCLA, an arranger, one of the four categories of PRPs, is defined

as follows:

---

[7] The four categories of PRPs include:
(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or
operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or
treatment, or arranged with a transporter for transport for disposal or treatment, of
hazardous substances owned or possessed by such person, by any other party or entity,
at any facility or incineration vessel owned or operated by another party or entity and
containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to
disposal or treatment facilities, incineration vessels or sites selected by such person, from
which there is a release, or a threatened release which causes the incurrence of response
costs, of a hazardous substance. 42 U.S.C. § 9607(a).

> any person who by contract, agreement, or otherwise arranged for
> disposal or treatment, or arranged with a transporter for transport for
> disposal or treatment, of hazardous substances owned or possessed
> by such person, by any other party or entity, at any facility or
> incineration vessel owned or operated by another party or entity and
> containing such hazardous substances.

42 U.S.C. § 9607(a)(3).

In interpreting CERCLA § 9607(a)(3), the Supreme Court has held that one qualifies as an arranger "under the plain language of the statute . . . when it takes intentional steps to dispose of a hazardous substance." *Burlington Northern & Santa Fe Railway Co. v. United States,* 556 U.S. 599, 611 (2009).

Defendant's Motion for Summary Judgment argues that Plaintiff has failed to establish a genuine dispute of a material fact (1) that Worthington Industries was ever involved at the Site during the relevant time period of 1953-1969 and (2) that it disposed of "hazardous substances" at the Site. Defendant also argues there is no "evidence in the record of any intent by Worthington Industries to 'dispose' at the Site," or that a release occurred that caused the incurring of response costs. Finally, Defendant argues that any RI/FS costs that Plaintiff seeks in its Complaint for CERCLA contribution under § 113(f) are time-barred. Doc. #67-1, PAGEID1441.

For the reasons set forth below, the Court finds that Plaintiff has failed to establish a *prima facie* case for cost recovery liability against Worthington Industries under 42 U.S.C. § 9607(a).

## B. Worthington Industries and Hazardous Substances

Worthington Industries argues that it is not liable as an arranger under CERCLA § 9607(a)(3) due to Plaintiff's failure to identify a "hazardous substance" that Defendant allegedly disposed of at the Site. Defendant asserts that the only evidence of what was allegedly disposed of by them at the Site is from deposition testimony of Anthony Kohnen ("Kohnen"), now deceased. Kohnen appeared for an administrative deposition before the United States Environmental Protection Agency ("EPA") in 2001 and in 2003 was again deposed by the EPA pursuant to Rule 27 of the Federal Rules of Civil Procedure. This witness operated a solvent recovery business known as Kohnen-Lammers, Inc., at the Site from approximately 1953 until 1969. Kohnen testified that his business picked up eight to fifteen drums from "Worthington Corporation"[8] once every five to eight weeks. Doc. #62-2, PAGEID##828-29. The only description provided by Kohnen of what was inside the drums was "dirty solvents." Doc. #67-4, PAGEID#1453. Plaintiff has provided no further details from any other witness of the nature or type of "dirty solvents" allegedly inside the drums. Doc. # 67-1, PAGEID#1434.

---

[8] Defendant argues that "Worthington Corporation" is "unrelated" to Defendant Worthington Industries. Doc. #67, PAGEID##1433-1434; 1437-1438. Plaintiff, however, asserts that Defendant is the successor to "Worthington Corporation." Doc. #70, PAGEID##1895-97. Because this is a motion for summary judgment, the Court construes the evidence most strongly in Plaintiff's favor and accepts as true that Worthington Industries was a customer of Kohnen's solvent recovery business.

In order to establish that Worthington Industries has CERCLA liability as an arranger and that Plaintiff has established a *prima facie* case of cost recovery liability, Plaintiff must produce evidence that Defendant disposed of or arranged with a transporter for transport, disposal or treatment of "hazardous substances." 42 U.S.C. § 9607 (a)(3). "Hazardous substances" are specifically defined under 42 U.S.C. § 9601(14)[9] and, without any further explanation of what constitutes "dirty solvents," Defendant asserts that Plaintiff has not established that Worthington Industries is liable as an arranger. Worthington Industries further argues that expert testimony is required in order to identify the allegedly "hazardous substances" disposed of at the Site and that Plaintiff has produced no such testimony. *Hobart Corp. v. Dayton Power & Light Co.*, 2017 U.S. Dist. LEXIS 197856, *23-27 (S.D. 2017) ("Whether the waste at issue contained hazardous substances - foundry cores or some other hazardous materials - is necessarily the

_____

[9] The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

subject of expert witness testimony and may be addressed in the next round of summary judgment motions."). Doc. #67-1, PAGEID#1434.

In response to Defendant's argument that the PRP Group has failed to identify the "hazardous substances," Plaintiff asserts that the identification of the "dirty solvents" testified to by Kohnen in 2003 can be further explained by expert testimony as well as "overall evidence" so that the Court can make the determination at trial. Doc. #70, PAGEID#1900. Plaintiff, however, has not offered any expert testimony or any further evidence beyond Kohnen's description.

Because this is a motion for summary judgment, the evidence is construed most strongly in favor of Plaintiff. If, however, the PRP Group, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment will be entered against it. *Celotex Corp.* 477 U.S. at 322. In this case, Plaintiff must establish that the "dirty solvents," that were allegedly picked up in drums every five to eight weeks and transported to the Site were, in fact, "hazardous substances" as defined by CERCLA § 9601(14). Because Plaintiff has presented no expert testimony identifying whether the "dirty solvents" were, in fact, "hazardous substances," it has failed to establish that Defendant is liable as an arranger under 42 U.S.C. § 9607(a)(3). Accordingly, Worthington Industries's motion for summary judgment, Doc. #67, is sustained.

## VI. Conclusion

For the reasons set forth above, the Motion for Summary Judgment of Defendant, Dayton Industrial Drum Inc., Doc. #61, is SUSTAINED and Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability against Dayton Industrial Drum, Doc. #64, is OVERRULED as moot. The Motion for Summary Judgment of Defendant, Worthington Industries, Inc., Doc. #67, is SUSTAINED.

Because the Court, by separate Decision and Entry, will sustain the Motion for Summary Judgment of Defendants, ETC Sunoco Holdings, LLC F/K/A Sunoco, Inc. and Carboline Company, Doc. #60, Plaintiff's claim against Defendant, Yenkin-Majestic Paint Corp., is the sole remaining claim at issue in this case.

A conference call with counsel is scheduled for Tuesday, April 14, 2020, at 4:30 p.m.


Date: March 26, 2020

_____
WALTER H. RICE
UNITED STATES DISTRICT JUDGE