IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LAMMERS BARREL PRP
GROUP,

      Plaintiff,

      v.

CARBOLINE COMPANY, et al.,

      Defendants.

:

:

:

:

Case No. 3:17-cv-00135

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT OF DEFENDANTS ETC SUNOCO HOLDINGS, LLC F/K/A
SUNOCO, INC. AND CARBOLINE COMPANY (DOC. #60);
OVERRULING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST CARBOLINE COMPANY (DOC. #65) AND
OVERRULING AS MOOT PLAINTIFF'S MOTION TO FILE
RESPONSES TO CARBOLINE COMPANY'S SECOND SET OF
REQUESTS FOR ADMISSIONS OUT OF TIME (DOC. #68);
CONFERENCE CALL SET FOR TUESDAY, APRIL 14, 2020, AT 4:30
P.M.

---

Plaintiff, Lammers Barrel PRP Group ("PRP Group" or "Plaintiff"), sued

several defendants under the Comprehensive Environmental Response,

Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C.

§§ 9601 et seq., seeking contribution under § 113(f), 42 U.S.C. § 9613(f), and

declaratory relief under § 113(g)(2), 42 U.S.C. § 9613(g)(2). Doc. #1. The PRP Group

alleges that these defendants are liable for past and/or future response costs

incurred by them in connection with the Lammers Barrel Factory Superfund Site

("Site"). Pursuant to the Court's Preliminary Pretrial Order, Doc. #56, discovery has been completed.

This matter is currently before the Court on a Motion for Summary Judgment filed by Defendants, ETC Sunoco Holdings, LLC f/k/a Sunoco, Inc. ("Sunoco"), and Carboline Company ("Carboline"), a Delaware corporation formed in 1980. Doc. #60. Sunoco and Carboline will be referred to collectively as "Defendants." Also, before the Court is a Motion for Partial Summary Judgment filed by Plaintiff against Carboline, Doc. #65, and Plaintiff's Motion to File Responses to Carboline Company's Second Set of Request for Admissions Out of Time, Doc. #68.

Plaintiff has alleged that Carboline and/or Sunoco have successor liability for an entity known as The Moran Paint Company ("Moran Paint").[1] According to the Complaint, Moran Paint was an owner and/or operator at the Site, under CERCLA § 9607(a)(1), until it relocated its facility in approximately 1951. Thereafter, Plaintiff alleges that Defendants became liable as arrangers under CERCLA § 9607(a)(3).

In considering theses motions for summary judgment, the Court will provide a brief background of the Site, including the relevant legal proceedings

---

[1] Plaintiff's Complaint alleges that Carboline is liable as a successor to Moran Paint and that "[A]lternatively" Sunoco is the successor to Moran Paint due to a series of mergers beginning in January 1980, between Carboline and Sun Company, Inc., n/k/a Sunoco. Doc. # 1, PAGEID#8. Plaintiff's motion for partial summary judgment on the issue of liability, however, is directed only to Carboline.

and decisions pertaining to its clean-up, as well as the legal relationship of Moran Paint, Carboline and Sunoco. The Court will then review the standard that guides its decisions in ruling on motions for summary judgment followed by an analysis of the motions including the admissibility of the depositions of Anthony Kohnen ("Kohnen") and Cecil Brown("Brown"), taken pursuant to Rule 27 of the Federal Rules of Civil Procedure.[2]

## I.      Background and Procedural History

### A.  The History of the Site and Related Litigation

The Site, located at the intersection of Grange-Hall Road and East Patterson Road in Beavercreek, Greene County, Ohio, consists of approximately 2.5 acres with a creek running east to west through the center. Doc. #1, PAGEID#2. From approximately 1944 until 1969, there were several industrial operations at the Site and from 1944 to 1951, the Moran Paint Company ("Moran Paint") operated a paint production facility at the Site. *Id.*, PAGEID##2, 3 and 6. This company also owned the Site from at least 1948 to 1951. *Id.*, PAGEID#7. Moran Paint manufactured paint removers, paint thinners and paint constituents as well as blended and recycled solvents. It also stored chemicals in storage tanks on the Site. *Id.*, PAGEID##6 and 7. According to allegations of the PRP Group,

---

[2] The admissibility of the Rule 27 depositions of Kohnen and Brown is also the subject of a motion *in limine*, Doc. #34-1, filed by the United States of America in *United States of America v. Dayton Industrial Drum, Inc. and Sunoco, Inc.*, Case No. 3:16-cv-232 (S.D. Ohio June 10, 2016) ("2016 DID Cost Recovery Case").

"[H]azardous substances from Moran Paint's operations were released at or from the Site during the time period Moran Paint owned and/or operated the Site." *Id.*, PAGEID#7. In 1951, Moran Paint "moved from the Site and eventually relocated its manufacturing operations to Xenia, Ohio, in approximately 1957." *Id.*

In 1952, Kohnen, through his company, purchased the Site and "conducted waste solvent distillation and fractionation operations until a fire destroyed operations at the Site on September 30, 1969. 2016 DID Cost Recovery Case, Doc. #34-2, PAGEID#474.[3] Also included at the Site during a portion of these 17 years, from approximately 1955 until about 1964, was a barrel reconditioning operation known at the time as the Lammers Barrel Corporation and later as Dayton Industrial Drum, Inc. Doc. #1, PAGEID#9.[4] According to the Complaint, the Site operations involved the "purchase, storage, reclamation and sale of industrial solvents including chlorinated VOCs [volatile organic compounds] from about 1955 until in or about 1964." *Id.*

In late 1985, wells in the vicinity of the Site were found to be contaminated with VOCs. *Id.*, PAGEID#3. In 1986, the EPA completed a Removal Action with

---

[3] Plaintiff has cited to the motion *in limine* filed by the United States of America in the DID Cost Recovery Case regarding the Rule 27 depositions of Kohnen and Brown and has incorporated the arguments of the United States in its response in opposition to Defendants' motion for summary judgment. Doc. #68, PAGEID#1536.

[4] The two companies conducting operations at the Site during this time used a number of names including Lammers, Inc., Kohnen Chemical Co., Kohnen-Lammers, Inc., Lammers Barrel Inc., Kohnen Chemical and Barrel Co., Kohnen and Lammers Chemical Company and Lammers and Kohnen Barrel Company. Doc. #65, PAGEID#1160.

nine residences connected to an existing water main. Four additional homes were later connected to the County water supply in 2000. Doc. #61-3, PAGEID#511.

Following this discovery of VOC contamination in 1986, the United States Environmental Protection Agency ("EPA") conducted various response activities and under a 2002 Administrative Order on Consent for Remedial Investigation("RI")/Feasibility Study ("FS") ("2002 AOC"), Plaintiff and others agreed to examine ways to remedy the contamination at the Site, as well as to reimburse oversight costs incurred by the EPA and the Ohio EPA. Doc. #1, PAGEID#3. The Site was placed on the National Priorities List, and in August 2008, the parties to the AOC completed, and the EPA approved, the RI for the Site. *Id.*

On or about June 30, 2011, the respondents to the 2002 AOC completed, and the EPA approved, the Operable Unit 1 Feasibility Study ("OU1 FS").[5] Based on the information collected in the RI and the OU1 FS, the EPA selected a remedy for OU1 in a Record of Decision ("OU1 ROD") which was issued by the EPA on September 27, 2011. *Id.* Additional investigation of the contaminated groundwater plume and the Operable Unit 2 Feasibility Study ("OU2 FS") is ongoing. *Id.*

On or about May 4, 2012, EPA, the PRP Group and others began negotiating a Remedial Design/Remedial Action ("RD/RA") Work Plan to implement the OU1 ROD. These negotiations were completed on July 31, 2013.

---

[5] The Site was divided into Operable Unit 1 ("OU1"), for the on-site soil and groundwater contamination, and Operable Unit 2 ("OU2"), for the off-Site groundwater contamination.

As a result of the VOC contamination at the Site, the United States filed a Complaint, under §§ 106,107 and 113 of CERCLA, on January 31, 2014, against the PRP Group and others entitled *United States v. 3M Company*, et al., No. 3:14-cv-32. *Id.*, PAGEID#5. On April 22, 2014, this Court entered the Remedial Design/Remedial Action ("RD/RA") and De Minimis Consent Decree between the EPA and Plaintiffs, along with several non-performing settling defendants ("2014 CD"). *Id.*[6] According to the 2014 CD, the PRP Group was required to pay certain EPA past response costs and to perform the response cost activities mandated by the OU1 ROD at the Site.

On August 2, 2016, the United States of America sued Dayton Industrial Drum, Inc., ("DID") and later, in an Amended Complaint, joined Sunoco, pursuant to § 107(a) of CERCLA. *United States of America v. Dayton Industrial Drum, Inc*. Case No 3:16-cv-232, United States District Court for the Southern District of Ohio ("2016 DID Cost Recovery Case"). The suit sought the recovery of unreimbursed costs incurred by the United States for response activities undertaken due to "the release or threatened release of hazardous substances from facilities" at and near the Site. The suit also sought a declaratory judgment against DID and Sunoco seeking joint and several liability for any further response costs that may be incurred and not otherwise reimbursed. The United States alleges that Sunoco is the "legal successor to one or more entities known as the Moran Paint Company"

---

[6] The Complaint incorrectly alleges that the 2014 CD was entered by this Court on May 8, 2014.

which owned and operated a paint manufacturing business at the Site and later arranged for the disposal and treatment of hazardous substances there. *Id.*, Doc. #4, PAGEID#20. On July 3, 2019, DID paid $825,000 to the United States and entered into a Consent Decree ("2019 CD") in the 2016 DID Cost Recovery Case. 2016 DID Cost Recovery Case, Doc. #56; PAGEID#805. This litigation remains pending against Sunoco.[7]

On April 21, 2017, the PRP Group filed this case against Carboline[8] and several other defendants seeking contribution, under CERCLA, § 113(f), for Plaintiff's share of the response costs incurred or to be incurred by them in connection with the release or threatened release of hazardous substances at the Site. As of the filing of this Complaint, Plaintiff has allegedly incurred over $6 million in response costs and "will continue to incur millions of additional dollars of response costs to perform the various response costs activities at the Site." Doc. #1, PAGEID#5. According to the Complaint, additional investigation of a contaminated groundwater plume that migrates off-Site to the east ("OU2") is the subject of the ongoing Feasibility Study.

---

[7] On January 13, 2020, the United States filed a Notice of Lodging of Consent Decree, Doc. #83, stating that it had reached a settlement with Sunoco and Carboline as an "Additional Covered Party." The proposed settlement included the 2016 DID Cost Recovery Case and the instant litigation filed by the PRP Group. On March 2, 2020, the United States filed a Motion to Enter Consent Decree, Doc. #84, and on March 20, 2020, Sunoco filed a Response to the Motion to Enter Consent Decree, Doc. #85.

[8] Pursuant to Defendant Carboline Company's Corporate Disclosure Statement, Doc. #19, Carboline is an indirect subsidiary of RPM International Inc. ("RPM"). This company has a financial interest in the outcome by reason of an indemnity agreement entered into between an indirect subsidiary of RPM and Sunoco, Inc.

## B. Moran Paint, Carboline and Sunoco

In either 1951 or 1952, Moran Paint, which was first incorporated in Ohio in 1939, left the Site. In 1957, it relocated its paint manufacturing facility to Xenia Township in Greene County, Ohio. Doc. #1, PAGEID#7; Doc. #65, PAGEID##1219, 1213. On October 2, 1962, Moran Paint adopted a resolution to wind-up, dissolve and liquidate its assets within 12 months. Doc. #60, PAGEID#302. On October 30, 1963, Moran Paint sold its "manufacturing assets, real property and buildings located in Xenia, Ohio, along with its trade name and certain product lines" to Carboline Company of Ohio, Inc. ("Ohio Carboline"), an Ohio corporation formed October 14, 1963. Doc. #60-5, PAGEIDE302; Doc. #60-12, PAGEID#427; Doc. #65, PAGEID#1219. On December 12, 1963, Moran Paint, through its President, Michael Moran, and Secretary, John Henehan, dissolved the 1939 Ohio company and assumed personal liability for any premiums due to the Ohio Bureau of Workers Compensation. Doc. #60-6, PAGEID#310. Although no documentation detailing the alleged asset purchase agreement has been located by the parties, Defendants assert that Carboline of Ohio did not assume any liabilities of Moran Paint. Doc. #60-12, PAGEID#427. *Id.* Following the October 30, 1963, sale, Carboline of Ohio amended its articles of incorporation and changed its name to The Moran Paint Company. Doc. #60-12, PAGEID#427.

Before Carboline's purchase of Moran Paint, Carboline was headquartered in St. Louis, Missouri and "manufactured none of its coating lines itself; it relied

exclusively on toll manufacturers."[9]  These toll manufacturers produced the

Carboline coating lines at their own facilities also located in St. Louis. *Id.*

Carboline purchased Moran Paint in Xenia in order to have a manufacturing

facility to eliminate the cost of the toll manufacturers, Doc. #60-3, PAGEID#290.

Moran Paint then "became a division within the new organization." *Id.*,

PAGEID#292.  An "engineer named Vic Flack from St. Louis" came in after the

purchase of Moran Paint, "as general manager to expand the operations at the

Xenia facility and [to] introduce Carboline's product lines." Doc. #60-12,

PAGEID#427.  With "hundreds of thousands of dollars" borrowed "in order to

expand operations, which included acquiring machinery like high-speed

dispersers and building a new warehouse with all of Carboline's product lines," all

of the newly introduced lines were manufactured at the Xenia plant.  Doc. #60-12,

PAGEDI#427-28.   As a result, the number of employees at Xenia increased from

15 to over 100. *Id.*

In January 1980, Moran Paint and other companies were merged into the

Carboline Company headquartered in St. Louis, Missouri. Doc. #1, PAGEID#8.

Thereafter, Carboline of Missouri was merged into Sun Company, Inc., which later

changed its name to Sunoco.  2016 DID Cost Recovery Case, Doc. #29-1,

---

[9] Toll manufacturing or processing is an arrangement in which a company, which has specialized equipment, manufactures or processes raw materials or semi-finished goods for another company.

PAGEID##215 and 216.[10]  Also in 1980, Carboline, the named Defendant herein, was incorporated as a Delaware corporation. Doc. #73, PAGEID#2508.

## II.    Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

---

[10] These allegations are taken from the Amended Complaint in the 2016 DID Cost Recovery Case, Doc. #4, but are not disputed by Sunoco.

475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998). In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so

chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).


III.     **Sunoco and Carboline's Motion for Summary Judgment (Doc. #60)**

     **A. CERCLA Liability as an Owner/Operator and Arranger**

Plaintiff is seeking contribution under CERCLA § 113(f) against Carboline, or, alternatively, Sunoco, due to the actions of Moran Paint. In order to establish CERCLA § 113(f) liability, however, Plaintiff "must look to § 107 to establish the basis and elements of the liability" of Moran Paint. *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 656 (6th Cir. 2000) (quoting *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 350 (6th Cir. 1998)).

To establish a *prima facie* case for CERCLA recovery under § 107(a) against Moran Paint, the PRP Group must prove that (1) the property is a "facility"; (2) there has been a "release" or "threatened release" of a hazardous substance; (3) the release has caused the plaintiff to incur "necessary costs of response" that are "consistent" with the NCP; and (4) the defendant is in one of four categories of potentially responsible parties ("PRPs"). *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006).

In this case, Plaintiff's Complaint alleges that Moran Paint qualifies in two of the four categories of PRPs at the Site: (1) an owner/operator, under 42 U.S.C. § 9607(a)(2), from approximately 1944 to 1951, and (2) an arranger of hazardous substances, under 42 U.S.C. § 9607(a)(3), from 1957 through 1969. Under CERCLA,

an owner/operator is defined as "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C.§ 9607(a)(2). An arranger is defined under CERCLA as

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,

42 U.S.C.§ 9607(a)(3).

Assuming that Plaintiff can establish a *prima facie case* under CERCLA § 107(a), including showing that Moran Paint acted as an owner/operator and/or an arranger during the relevant time period, the PRP Group must still prove that one or both Defendants are liable as a successor to Moran Paint.

Defendants' motion for summary judgment asserts that neither Sunoco nor Carboline can be held liable as a successor for any conduct alleged against Moran Paint, based on the undisputed facts of the case, as well as Plaintiff's failure to respond for over nine months to Carboline's requests for admissions. Defendants also contend that there is no "competent evidence" of any releases at the Site, during the time that Moran Paint was either an owner/operator or an arranger. Specifically, Sunoco and Carboline contend that (1) the Rule 27 depositions of Kohnen and Brown cannot be used against Defendants, (2) Plaintiffs experts cannot establish a release before the 1969 fire and (3) after the October 30, 1963,

transaction, Moran Paint sent hazardous substances to the Armentrout Landfill and not to the Site.  Finally, Defendants argue that Plaintiff's claims for RI/FS costs are time-barred.

The Court will next turn to the law of successor liability for Defendants under CERCLA, first as an owner/operator of the Site and then as an arranger.

### B. Successor Liability of Carboline and Sunoco for Moran Paint as an Owner/Operator of the Site from 1944-1951

Plaintiff alleges that from 1944 to 1951, Moran Paint was the owner/operator of the Site and that expert testimony will show that a release occurred at the Site, creating liability for Moran Paint and ultimately for Carboline and, alternatively, Sunoco.  Defendants, however, argue that there is no evidence of a release of hazardous substances at the Site during this time period, since Richard Williams, one of Plaintiff's experts, has testified that his "5% allocation" to Moran Paint was "an arbitrary allocation." Although the existence of a release of hazardous substances at the Site and the amount attributable to Moran Paint may create a genuine dispute of material fact, the issue before the Court is otherwise, to wit: whether successor liability exists for Carboline or Sunoco for the actions of Moran Paint as an owner/operator of the Site.

The question of successor liability under CERCLA is governed under Ohio corporation law. *See City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 250 (6th Cir. 1994).  Although the general rule is that "the purchaser of a corporation's

14

assets is not liable for the debts and obligations of the Seller corporation," *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 347, 617 N.E.2d 1129, 1132 (Ohio 1993), four exceptions exist.

> A successor corporation may be held liable when "(1) the buyer expressly or impliedly agrees to assume such liability; "(2) the transaction amounts to a de facto consolidation or merger;" (3) the buyer corporation is merely a continuation of the seller corporation; or "(4) the transaction is entered into fraudulently for the purpose of escaping liability." (citing *Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St. 3d 60, 62 (1987)).

If one or more of these exceptions applies, the purchaser of the assets, in this case Carboline of Ohio, will be held liable for Moran Paint's obligations, regardless of any agreement to the contrary. Plaintiff further alleges that if Carboline of Ohio is liable, then Sunoco will also be liable as a successor to Carboline and Moran Paint due to the mergers that occurred in January 1980. Doc. #1, PAGEID##6 and 8.

Defendants argue that no successor liability exists, since Carboline of Ohio did not assume any liabilities of Moran Paint when it acquired the Xenia paint manufacturer in October 1963. In making this argument, Defendants cite to the affidavit of John F. Montle, Carboline's former Vice President of Research and Development, Vice President of Technology, and later "President of The Moran Paint Company, a wholly owned subsidiary of Carboline Company formed in 1963 as Carboline Company of Ohio ("Montle Affidavit")." Doc. #60-12, PAGEID#427. "When Carboline Company of Ohio acquired certain assets of The Moran Paint Company in 1963, it did not assume any of that entity's liabilities." *Id.*

Plaintiff, however, contends that a genuine issue of a material fact exists as to successor liability. The PRP Group argues that the Carboline purchase of Moran Paint in October 1963, was a "de facto merger" and/or a "continuation," of the former Moran Paint. A "continuation," according to the PRP Group, is "an independent and alternate theory of liability." Doc. #65, PAGEID#1149.

As argued by Plaintiff, a *de facto* merger exists when "[T]he transaction that results in the dissolution of the predecessor corporation is in the nature of a total absorption of the previous business into the successor." *Welco*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134. Doc. #65, PAGEID#1147. A *de facto* merger has four characteristics:

> (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations.

*Id*.

No single factor is determinative in concluding that a *de facto* merger exists and it may be found even without all of the four characteristics being present. *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F. Supp.2d 644, 658 (S.D. Ohio 2002).

Defendants argue that the continuation of the previous business activity is refuted by the Montle Affidavit as well as the testimony of the Carboline corporate representative, Dwayne Meyer, Doc#60-3, PAGEID#284. According to Carboline and Sunoco, while the name of Moran Paint continued after the acquisition of Carboline of Ohio, the manufacturing and growth of the Xenia facility changed

dramatically as it became the manufacturing center for the St. Louis based entity

and eliminated Carboline's reliance on toll manufacturing. Carboline "borrowed

hundreds of thousands of dollars to expand operations," and brought in new

personnel, paint formulas and systems of manufacturing in order to make Moran

Paint in Xenia, Ohio, the manufacturing center for all of Carboline.

In support of Plaintiff's argument that there was a continuation of the

corporate personnel at Moran Paint after the October 1963 purchase, the PRP

Group argues that Moran Paint continued to manufacture paint. Plaintiff further

argues that there was a continuation in corporate personnel and attaches several

newspaper articles from the Xenia Gazette and the St. Louis Post Dispatch,

allegedly reporting on the sale, status of the operation and personnel changes.

Doc. #65-1, PAGEID##12225,1241,1243,1249,1251 and 1253. Although Defendants

in their reply characterize these newspaper articles as "inadmissible hearsay,"

Doc. #73, PAGEID#2509, under Fed. R. Civ. P. 56 (c)(2), the Court can consider

these articles, at the summary judgment stage, assuming they can be properly

authenticated at trial.

Even assuming admissibility at trial, however, the Court does not find that

these articles establish "a continuation of personnel." Moran, "owner of the

company before it was sold to Carboline" and the former president of Moran

Paint, although initially described "as president" after the acquisition, is later

referenced as a "special assistant to the president" of Carboline and on the

Carboline Board of Directors. Doc. #65-1, PAGEID##1225, 1241 and 1249. The

articles also state that at some time after the transaction, John Henehan, the former corporate secretary of Moran Paint, was "in charge of operations of the local plant" and Robert Lipp, "formerly sales manager of the industrial division, was named general manager of industrial sales and research and development." Doc. #65-1, PAGEID##1241. That two individuals allegedly stayed on with the new Moran Paint is not, however, enough to establish continuation, particularly when it is uncontested that the company grew from approximately 15 employees to over 100 after the October 1963 transaction. Moreover, the Court notes that the newspaper articles also reference other individuals at Moran Paint and it is unknown if they were affiliated with the company prior to October 1963 or, as is reported for "Victor L. Flack of St Louis," who allegedly became manager of the company's plant in Xenia," were individuals from Carboline in St. Louis. Doc. #65-1, PAGEID#1253.

As to the second element of a *de facto* merger, Plaintiff simply speculates and does not present any evidence that there was a "continuity of shareholders or sale of assets for stock." Doc. #65, PAGEID#1148 ("All of the assets, *which likely* included stock, were transferred to [the Moran Paint entity purchased by Carboline] during the acquisition.") (emphasis added.)

Nor has Plaintiff established the third element of a *de facto merger*, the immediate or rapid dissolution of the predecessor corporation. Although the Ohio 1939 Moran Paint entity dissolved two months after the October 30, 1963, transaction, there is also evidence that this dissolution and liquidation was

18

actually planned one year earlier, as seen by the October 2, 1962, resolution to wind-up, dissolve and liquidate the assets of Moran Paint "within 12 months." Doc. #60, PAGEID#302.

Finally, Plaintiff has not established that Carboline assumed Moran Paint's liabilities and obligations ordinarily necessary to continue the predecessor's business operations. In fact, Plaintiff has presented no challenge to the Montle Affidavit, stating that there was no assumption of Moran Paint's liabilities.

The PRP Group next argues that successor liability exists since, after the October 30, 1963, transaction, Moran Paint "existed under the same leadership, held the same physical facilities, [officers], employees, and product lines" and "was a reincarnation and mere continuation" of the original Moran Paint. Other than Moran Paint remaining in Xenia, Ohio, and Carboline of Ohio changing its name to Moran Paint, there is no evidence, for the reasons previously addressed in the *de facto* merger analysis, that there was a "reincarnation" or "mere continuation" of the former Moran Paint. Although Moran remained as the statutory agent for Moran Paint, the leadership, officers, employees and product line were not "unchanged."

Based on the above-cited testimony and documents, including the newspaper articles attached to Plaintiff's response, there is no genuine issue of a material fact that either Carboline or Sunoco has successor liability for the actions of Moran Paint during the time period it was a prior owner/operator of the Site.

## C. Successor Liability of Carboline and Sunoco for Moran Paint as an Arranger from 1957 to 1969

The PRP Group next argues that successor liability exists for Carboline and Sunoco for the actions of Moran Paint as an arranger from 1957 through September 1969. Because the Court has determined that no successor liability exists for Carboline or Sunoco, prior to Carboline of Ohio's transaction on October 30, 1963, the relevant inquiry is whether Defendants have successor liability for the actions of Moran Paint as an arranger under CERCLA § 9607(a)(3) for the time period after October 30, 1963, through the date of the September 30, 1969, fire.

At the heart of this dispute are the Rule 27 depositions of Brown and Kohnen, now both deceased. These depositions were taken by the United States pursuant to a Petition to Perpetuate Testimony, filed March 14, 2003 ("Petition"), a hearing held on June 17, 2003 ("Hearing") and an Order filed June 18, 2003 ("Order"). *In re Petition of the United States of America to Perpetuate Testimony Pursuant to Rule 27 of the Federal Rules of Civil Procedure*, Case No. 3:03-mc-00005, Doc. ##1, 3, 4 and 5.

Plaintiff argues that based on the Rule 27 deposition testimony of Kohnen taken August 8, 2003, Moran Paint has liability as an arranger. This is so, according to Plaintiff, since Kohnen testified that Moran Paint was a customer of Kohnen and Lammers for three to five years, material was picked up from Moran Paint in bulk by a tanker, that a typical load would be five to six thousand gallons of waste solvents and paint thinners and that this occurred once every five to six

weeks. Doc. #65, PAGEID#1216. Defendants, however, contend that the Rule 27 depositions of Kohnen and Brown cannot be used against them since Carboline received no notice of the depositions and the notice that Sunoco received referenced only a subsidiary of Sunoco, known as "Sunoco, Inc. (R&M),"[11] and failed to indicate that Sunoco had any connection to Moran Paint. Doc. #60-1, PAGEID#267. Defendants argue that although Sunoco received the Petition, notice of Hearing, and Order, and sent an attorney to the depositions to represent a Sunoco subsidiary, the Petition failed to disclose the "the names or a description of the persons whom the petitioner expects to be adverse parties" as required by Rule 27(a)(1)(D). As a result, the Sunoco attorney did not question Kohnen or Brown regarding Moran Paints and only represented the identified Sunoco subsidiary, Sunoco, Inc. (R&M).

Plaintiff responds to this argument by adopting and incorporating "the arguments made by the United States on this issue in its pending Motion *in Limine* in the [2016 Cost Recovery Case]." Doc. #68, PAGEID#1536; 2016 DID Cost Recovery Case, Docs. ##34 and 39.[12]

The Court has reviewed the Petition and Order, as well as the affidavits and exhibits in this case concerning this issue as well as in the 2016 DID Cost Recovery Case, Docs. ##34, 35, 37(sealed) and 39. Because the Court finds that Carboline

---

[11] Sunoco, Inc. (R&M) is n/k/a Sunoco (R&M), LLC.

[12] Because the Consent Decree has not been entered by this Court in the 2016 Cost Recovery Case, the case against Sunoco remains pending. *See* n. 7 herein.

was not given any notice of the Rule 27 depositions of Kohnen and Brown and that the notice given to Sunoco failed to comply with Fed. R. Civ. P. 27(a)(1)(D), the depositions of these two witnesses cannot be used. Without relevant evidence, there are no facts establishing successor liability. Therefore, no successor liability exists for Carboline and Sunoco for the actions of Moran Paint as an arranger from 1957 through September 1969.[13]

Therefore, the Motion for Summary Judgment of Defendants, ETC Sunoco Holdings, LLC f/k/a Sunoco, Inc. and Carboline Company, Doc. #60, is sustained.


IV.     **Plaintiff's Motion for Partial Summary Judgment Against Carboline Company (Doc. #65) and Plaintiff's Motion to File Responses to Carboline Company's Second Set of Requests for Admissions Out of Time (Doc. #68)**

Based upon the Court's decision sustaining the Motion for Summary Judgment of Defendants ETC Sunoco Holdings, LLC f/k/a Sunoco, Inc. and Carboline Company, Doc. #60, Plaintiffs' Motion for Partial Summary Judgment Against Carboline Company (Doc. #65) is overruled. Plaintiff has not established a genuine issue of a material fact that either Carboline or Sunoco is liable as a successor to Moran Paint as the prior owner/operator of the Site. Additionally, Plaintiff has not established a genuine issue of a material fact that either Carboline or Sunoco is liable as a successor to Moran Paint as an arranger. Finally,

---

[13] Decision and Entry Overruling Plaintiff's Motion *in Limine*, Doc. #34, 2016 DID Cost Recovery Case.

Plaintiff's Motion to File Responses to Carboline Company's Second Set of Requests for Admissions Out of Time (Doc. #68), is overruled as moot.[14]

## V.  Conclusion

For the reasons set forth above, the Motion for Summary Judgment of Defendants, ETC Sunoco Holdings, LLC f/k/a Sunoco, Inc., and Carboline Company, Doc. #60, is SUSTAINED.  Plaintiff's Motion for Partial Summary Judgment Against Carboline Company, Doc. #65, is OVERRULED.  Plaintiff's Motion to File Responses to Carboline Company's Second Set of Requests for Admissions Out of Time, Doc. #68, is OVERRULED as moot.

Because the Court, by separate Decision and Entry, has sustained the Motion for Summary Judgment of Defendants, Dayton Industrial Drum, Inc., Doc. #61, and Worthington Industries, Inc., Doc. #67, Plaintiff's claim against Defendant Yenkin-Majestic Paint Corporation is the sole remaining claim at issue in this case.

A conference call with counsel is scheduled for Tuesday, April 14, 2020, at 4:30 p.m.

Date: March 27, 2020

_Walter H. Rice_
_____
WALTER H. RICE
UNITED STATES DISTRICT JUDGE

_____

[14] In issuing this Decision and Entry, the alleged failure of Plaintiff to respond to Carboline's requests for admissions was not considered by the Court.